**Affirmed and Memorandum Opinion filed November 17, 2020.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-19-00734-CV

---

### GREGORY GREEN, Appellant

### V.

### HOUSTON FIREFIGHTERS' RELIEF AND RETIREMENT FUND, Appellee

---

**On Appeal from the 129th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2017-46605**

---

### MEMORANDUM OPINION

Appellant Gregory Green sought pension benefits from appellee the Houston Firefighters' Relief and Retirement Fund ("the Fund"). After the Fund denied Green's request, he appealed that decision to the trial court. *See* Tex. Rev. Civ. Stat. Ann. art. 6243e.2(1) § 12(a). The trial court denied Green's requested relief and this appeal followed. In two issues Green asserts the trial court erred because: (1) the Fund's decision was not supported by substantial evidence; and (2) he was denied

due process in which to present his case for pension benefits. We affirm.

## BACKGROUND

Green's appeal is authorized by article 6243e.2(1) of the Texas Revised Civil Statutes ("the Act"), which established a "Firefighters' relief and retirement fund" in each incorporated municipality with a population of at least 1,600,000 and a fully paid fire department. The Act calls for a ten-member board of trustees ("the Board"), six of whom constitute a quorum for transacting business of the Board. *Id*. § 2(b), (j). The Board consists of the mayor or an appointed representative of the mayor, the city treasurer, five firefighters who are members of the Fund and elected by members, a retired firefighter who is elected by other retired firefighters, and two citizens elected by the other trustees. *See id*. § 2(b)–(e). The role of the Board is to receive, manage, and disburse the Fund, hear and determine applications for benefits, and designate the beneficiaries or persons entitled to participate as provided by the Act. *See id*. § 2(k). The Act prescribes a variety of powers and duties bestowed on the Board to accomplish this purpose. *See id.* § 2, 3. The Act also prescribes standards regarding eligibility for retirement, disability, and death benefits and the amount of such benefits, *see id*. §§ 4–12, 14–16, 18, requirements for membership in the Fund, *see id*. § 13, and standards for calculating member and city contributions. *See id*.

One of the extensive Act's many subsections permits a member to apply for an on-duty disability pension. Tex. Rev. Civ. Stat. Ann. art. 6243e.2(1) § 6(a). Upon application, if the Board determines that a member is not capable of performing the usual and customary duties of his or her classification or position because of the on-duty disability, the member is entitled to a monthly disability pension of roughly 50

2

percent of the member's average salary. *Id.* at § 6(b)(1).[1] If the Board determines a member is not capable of performing any substantial gainful activity because of the on-duty disability, the monthly disability pension is roughly 75 percent of the member's average salary. *Id.* at § 6(c)(1). The determining factor between the two levels of on-duty disability is whether the member's on-duty disability prohibits the member from performing firefighter work, or any job at all.

On November 2, 2016, Green, a 17-year paramedic with the Houston Fire Department, applied for disability pension benefits with the Fund. Green sought on-duty disability benefits pursuant to section 6(c) of article 6243e.2(1), which provided benefits if the Fund's board "determine[d] that a member is not capable of performing any substantial gainful activity because of the member's on-duty disability." Tex. Rev. Civ. Stat. Ann. art. 6243e.2(1) § 6(c). Green's application was accompanied by a certification and diagnosis from Dr. Ashley Woolbert, Green's treating physician. On November 29, 2016, Green was terminated from the Houston Fire Department due to medical disability.

Woolbert submitted a letter with Green's application in which she stated that she was treating Green for Major Depressive Disorder and Chronic Post-Traumatic Stress Disorder. Woolbert stated that Green was responding to outpatient treatment and had been gradually improving until experiencing a traumatic event while on a paramedic call on May 22, 2016. On that date Green was dispatched to a scene in which an individual had been brutally beaten and killed. Woolbert described the event as Green being "exposed to [the] body of [a] man who was violently beaten to death[.]" Woolbert stated that this exposure triggered acute stress disorder resulting in suicidal ideation. Green was subsequently admitted to a hospital "as a direct result

---

[1] The amount of the monthly disability pension is determined by the firefighters' years of service. *See* Tex. Rev. Civ. Stat. Ann. art. 6243e.2(1) § 5 & 6.

of the mental health effects from this event." Woolbert also attached a letter in which she stated, "At this time due to [Green's] current medical condition, recommended intensive treatment program, and side effects from medications it is not recommended that patient maintain full time employment." Woolbert spent more than 40 hours treating Green over the course of one and a half years and noted that his symptoms worsened since the traumatic event on May 22, 2016, "and eventually led to symptoms which became life threatening."

In response to Green's application for on-duty disability, the Board asked Dr. Edwin Johnstone to perform a psychiatric disability/fitness evaluation on Green. Johnstone interviewed Green and reviewed medical records and official documents provided by the Board, including medical records from the Veterans Administration.

During Johnstone's interview of Green, Green gave a full biographical history. Green reported that his work as an EMT for the Houston Fire Department had been an emotional strain. Green described the event on May 22, 2016, when he accompanied emergency medical personnel to a "grisly murder scene." After witnessing that scene Green drove his fire department vehicle to Houston Methodist Hospital and was admitted for a one-week stay on the psychiatric ward. Upon Green's discharge from the hospital Woolbert diagnosed him with PTSD, Major Depressive Disorder, and Acute Stress Disorder.

To complete its review the Board asked Johnstone to answer certain questions. Johnstone responded to the Board's questions as follows:

1.    What is the current medical condition and prognosis?

Despite the content of documents from care providers, I am unable to be certain whether or not Mr. Green actually has the conditions that have been diagnosed. It appears to me that he has a personality disorder marked by persistent interpersonal clashes in a variety of settings. His story to me strongly suggests that he, at least in the past couple of years,

4

has resorted to making exaggerated and dramatized comments to manipulate other persons into believing that he is desperately disturbed so that he can gain attention and gain benefits of being thought to be disabled. His stories of consistently excellent performance are not verifiable in the documents I saw. It is common for persons with deceptive motives to present themselves as higher performers than they really were in school and at work. They commonly report heroic events that never occurred, or academic degrees they never earned.

*****

2.      Is the condition likely to be permanent?

Even if both the diagnosis of Major Depression and the diagnosis of Post-Traumatic Stress Disorder were accurate, it is not true at all that they are permanent.

Mr. Green didn't give anyone a story of an endogenous depressive disorder; he related the reputed depressive symptoms (all of which are invisible and unverifiable) entirely to situational influences. There is no reason whatsoever to imagine that a depressive state, even if it were genuine, would persist after Mr. Green is away from those circumstances. In most cases of genuine depression, even those with endogenous causes, patients achieve a durable remission of symptoms that can be maintained with continuing medication.

Despite currently popular misconceptions, Post-Traumatic Stress Disorder is not a permanent condition. The chapter on mental disorders in the second edition of the AMA Guides to the Evaluation of Disease and Injury Causation cites an abundance of medical research studies showing that most persons with that condition are free of the condition after six months, and that almost all cases have recovered by a year. The majority of cases resolve without seeking any treatment at all. Furthermore, studies have shown that the majority of patients actually report a beneficial feeling of personal growth, rather than a decline in mental health, after going through the experience.

3.      Is condition duty-related?

The condition of Post-Traumatic Stress Disorder as narrated by Mr. Green would be duty-related, and attributable to multiple exposure to ghastly scenes and to heart-rending failed efforts to save lives. Mr. Green didn't mention any combat experiences to me. If his story at the hospital were to be shown to be fictional, none of his claims can be

considered trustworthy.

The reputed depressive condition would be attributable to a combination of factors, the most powerful of which were losses of loved ones through suicide.

4.    Please comment on whether or not member can maintain any gainful employment, in any occupation (any fulltime 40 hour or more per week job) due to condition.

Mr. Green is capable, both physically and mentally, of maintaining adequate performance of an abundance of jobs except possibly ones that would involve unusual exertions of his left shoulder.

After giving this initial report Johnstone received additional medical records for Green. One of the records reviewed by Johnstone was a 1997 report from a VA psychologist who conducted a clinical interview, Beck Depression Inventory, Minnesota Multiphasic Personality Inventory, Incomplete Sentences Blank, and House-Tree-Person Drawings. The report was requested in connection with Green's disability claim. The report noted that Green served one year in Desert Storm and denied witnessing death or significant injuries. Green underwent two previous psychiatric evaluations and "had a number of disciplinary actions." Green reported distressing dreams of Desert Storm events associated with sleep disturbance but otherwise reported no significant psychiatric symptoms.

Johnstone also reviewed another VA psychologist's report that was prepared two years later. At that time Green reported "thinking about combat." Contrary to his report two years earlier Green said that during his military service he was almost killed and "nearly blown up." Green further reported being sent on "secret missions" during Desert Storm.

Ten years later Green underwent another psychological evaluation while he was working for the City of Houston. At that time Green reported that during his military service he witnessed the killing of enemies, comrades killed by friendly fire,

and his unit was mortared frequently. Green reported that his reconnaissance unit was intermittently "dropped off in unknown desert areas such as Bahrain, Kuwait and Saudi Arabia." Green reported recurring dreams of putting prisoners in "Chinese handcuffs" and a comrade dying in his platoon. The report reflected diagnoses for PTSD and Generalized Anxiety Disorder.

After reviewing the additional medical records, Johnstone filed an addendum to his report answering the first two questions as follows:

1.     Is Mr. Green's condition considered to be a pre-existing condition?

Yes, the only genuine psychiatric disorder I see in these records is a Personality Disorder that has persisted, guided, and dominated Mr. Green for all of his life from childhood onward. The pathological personality traits are the force behind motivation to exaggerate and/or to present false stories of conditions that don't exist, in hopes of achieving a collection of diagnoses that appear severe enough to gain disability benefits.

2.     Is the incident that occurred in HFD on May 22nd, 201[6] a separate incident that caused his PTSD or could this incident be a continuation from the military?

In the first place, there is no credible evidence that Mr. Green ever had genuine PTSD from the service experiences. The old records plainly show the fact that he belatedly concocted a fictional account of experiences designed to resemble psychological trauma. None of the stories he gives about effects of trauma exposure could emanate from events that didn't occur. In light of his having duped providers and examiners about military-derived PTSD, Mr. Green's more recent claims that a PTSD condition arose from his exposure to disturbing sights during work for the Houston Fire Department can't be trusted to be truthful.

The information from these documents reinforces the impressions I expressed in the original report.

Because Johnstone's report conflicted with Woolbert's report, the Board's policies and procedures provided for an evaluation by a third-party advisory

physician. According to the policies and procedures, the advisory physician was to be agreed upon by Woolbert, Green's treating psychiatrist, and Johnstone. The advisory physician was to conduct an independent psychiatric examination of Green. However, Green and the Board were unable to agree on an advisory physician to conduct the examination. Subsequently, Woolbert notified the Board that another examination conducted for a "nontherapeutic" purpose would be detrimental to Green's mental health; therefore, Green would not subject himself to evaluation by an advisory physician.

On May 16, 2017, with Woolbert's and Johnstone's conflicting reports, the Board denied Green's application for on-duty disability benefits, which Green appealed to the Board. On June 20, 2017, the Board denied Green's appeal of their denial of his request for disability.

Green then filed notice of appeal to the trial court pursuant to section 12 of the Act. *See* Tex. Rev. Civ. Stat. Ann. art. 6243e.2(1) § 12. Following briefing by both parties, the trial court affirmed the Board's decision to deny benefits to Green. This appeal followed.

### ANALYSIS

In two issues Green asserts (1) the Board's decision was not supported by substantial evidence; and (2) the Board's process deprived Green of due process.

### I.     Standard of Review and Applicable Law

The Fund is not subject to the Texas Administrative Procedures Act because it is not a state agency as defined by the statute. *See* Tex. Gov't Code Ann. § 2001.003(7). Instead, the Fund is governed by its enacting statute. *See* Tex. Rev. Civ. Stat. Ann. art. 6243e.2(1). We review the Board's and the trial court's decision under the "substantial evidence" rule. *See City of El Paso v. Public Util. Comm'n*,

8

883 S.W.2d 179, 185 (Tex. 1994) (providing for review under the substantial evidence review in appeal from agency decision not subject to the Administrative Procedures Act).

A court conducting substantial evidence review of an administrative order must presume the agency decision is valid and that substantial evidence supports it. *See Collingsworth Gen. Hosp. v. Hunnicutt*, 988 S.W.2d 706, 708 (Tex. 1998). Substantial evidence is more than a mere scintilla of evidence, but less than a preponderance of the evidence. *R.R. Comm'n of Tex. v. Torch Operating Co.*, 912 S.W.2d 790, 792–93 (Tex. 1995). In determining whether the Board's conclusions or decisions are reasonably supported by substantial evidence, the issue for the reviewing district court is not whether the Board reached the correct conclusion, but rather whether some reasonable basis exists in the record for the action taken by the Board. *See City of El Paso*, 883 S.W.2d at 185. Thus, the existence of substantial evidence turns on the question of reasonableness. *Id*. ("At its core, the substantial evidence rule is a reasonableness test or a rational basis test."). Thus, in conducting review for substantial evidence, the district court must determine whether the evidence as a whole is such that reasonable minds could have reached the conclusion the Fund reached in order to justify taking the disputed action. *Id*. at 186.

Under this deferential standard, we presume that the Board's order is supported by substantial evidence, and Green bears the burden of proving otherwise. *See Texas Health Facilities Comm'n v. Charter Med.-Dall., Inc.*, 665 S.W.2d 446, 453 (Tex. 1984). "Although substantial evidence is more than a mere scintilla, the evidence in the record actually may preponderate against the decision of the agency and nonetheless amount to substantial evidence." *Id*. at 452 (internal citation omitted). Substantial-evidence review "does not allow a court to substitute its judgment for that of the agency." *R.R. Comm'n*, 912 S.W.2d at 792.

**II.    The Fund's decision is supported by substantial evidence.**

On appeal Green argues that Johnstone's reports are not reliable under the Texas and Federal Rules of Evidence and that Johnstone's reports are conclusory. While section 12 allows the trial court to "fix a date for hearing the appeal," Tex. Rev. Civ. Stat. Ann. art. 6243e.2(1) § 12(b), the record does not reflect whether the trial court held a hearing on Green's appeal. If a hearing was held, no record of it was filed with this court. In conducting a substantial evidence review we rely on the briefing and evidence filed in the trial court.

**A.    Reliability of expert testimony**

Relying on *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 592 (1993) and *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549. 556 (Tex. 1995), Green argues that Johnstone's expert report was not reliable under the standards set forth in those cases.

Texas Rule of Evidence 702, entitled "Testimony by Experts," provides, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Tex. R. Evid. 702. Expert testimony is admissible if the expert is qualified and the testimony is relevant and based on a reliable foundation. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001). Once the party opposing the expert testimony objects, the proponent bears the burden of demonstrating admissibility of the testimony. *See Robinson*, 923 S.W.2d at 557.

Here, Green did not object to Johnstone's evidence before the Board or in the trial court. The Board argues that the rules of evidence do not apply to proceedings

before the Board or to appeals to the trial court from the Board's decision. In an appeal under the APA, a motion for rehearing in an administrative proceeding is a statutory prerequisite to appeal in a contested case. Tex. Gov't Code Ann. § 2001.145(a) and the standard for preservation of error is "fair notice." *Upper Trinity Reg'l Water Dist. v. Natl Wildlife Fed'n*, 514 S.W.3d 855, 870 (Tex. App.—Houston [1st Dist.] 2017, no pet.). While the Fund is not subject to the APA, we find no authority that permits an appellant to raise the issue of reliability of expert testimony for the first time on appeal.

The Act provides that, "The final decision or order of the district court is appealable in the same manner as are civil cases generally." Tex. Rev. Civ. Stat. Ann. art. 6243e.2(1) § 12(c). The Texas Rules of Appellate Procedure require that, absent exceptions that do not apply in this case, any error be preserved in the trial court. *See* Tex. R. App. P. 33.1. Error is preserved with regard to a ruling that admits evidence if the opponent of the evidence makes a timely, specific objection and obtains a ruling. *Serv. Corp. Intern. v. Guerra*, 348 S.W.3d 221, 234 (Tex. 2011). The trial court's ruling does not have to be express; error is preserved as long as "the record indicates in some way that the trial court ruled on the objection either expressly or implicitly." *Richard Nugent & CAO, Inc. v. Estate of Ellickson*, 543 S.W.3d 243, 259–60 (Tex. App.—Houston [14th Dist.] 2018, no pet.).

Here, Green asserts that he gave "fair notice" of his objection to the reliability of Johnstone's reports by sending a letter to the Board after its ruling on Green's disability application. The letter stated that the "only evidence" offered by the Fund to controvert the records and affidavits of Green's treating physician was "a hired 'expert' from an out of state firm who ignored over 7 plus separate healthcare providers[.]" The letter went on to assert that "the [Fund] physician" claimed Green's illness "was being made up without one medical test to support his opinion

11

except his personal interview[.]" Green's letter to the Board was insufficient to preserve error on appeal in that it was not timely or specific and Green failed to obtain a ruling from the trial court. Green therefore waived error with regard to his challenge to the reliability of Johnstone's evidence. *See* Tex. R. App. P. 33.1.

### B. Conclusory reports

At the trial court and on appeal Green asserts that Johnstone's reports amount to no evidence because they are conclusory.

A conclusory statement asserts a conclusion with no basis or explanation. *Windrum v. Kareh*, 581 S.W.3d 761, 768 (Tex. 2019). Bare or baseless opinions cannot support a judgment, even if there was no objection over their admission into evidence. *See City of San Antonio v. Pollock*, 284 S.W.3d 809, 816 (Tex. 2009). An "expert must explain the basis of his statements to link his conclusions to the facts." *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999); *see also Jelinek v. Casas*, 328 S.W.3d 526, 536 (Tex. 2010). An expert's statement or opinion is conclusory when: (1) he asks the fact finder to take his word that his opinion is correct but offers no basis for his opinion or the bases offered do not actually support the opinion; or (2) he offers only his word that the bases offered to support his opinion actually exist or support his opinion. *See Jelinek*, 328 S.W.3d at 536. The line determining whether an expert opinion is conclusory is difficult to draw, and "[c]lose calls must go to the trial court." *See Larson v. Downing*, 197 S.W.3d 303, 304 (Tex. 2006) (per curiam). When the evidence falls within the zone of reasonable disagreement, the court may not substitute its judgment for that of the fact finder. *See City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005).

In Johnstone's report he noted that he conducted a two-hour interview with Green and reviewed medical records and official documents provided by the Board. Johnstone noted that Green acknowledged that they had adequately discussed every

12

major aspect of Green's life. Green brought his own records to the interview and made copies for Johnstone's review. Johnstone explained to Green that the records had been requested but had not yet arrived, but Green insisted on making copies and providing them to Johnstone. Johnstone reviewed 49 pages of a 249-page medical record from Green's five-day stay at Methodist Hospital. Johnstone also reviewed documents sent by the City of Houston. Before filing a supplemental report Johnstone also reviewed psychological evaluations from the VA.

In answering the questions posed by the Fund, Johnstone referenced official diagnostic manuals for mental disorders and the American Medical Association Guides to the Evaluation of Disease and Injury Causation. Johnstone did not ask the Board and the trial court to take him at his word; Johnstone extensively interviewed Green, reviewed medical and employment records, and referenced medical reference books in arriving at his recommendation. We conclude Johnstone's report was not conclusory as to Green's ability to work at any job. *See Jelinek*, 328 S.W.3d at 536.

## C. Substantial evidence

The evidence before the Board and subsequently before the trial court was in direct conflict. Woolbert opined that Green experienced disability to the degree that he could not perform any full-time work. Johnstone, on the other hand, opined that Green's only limitation in performing full-time work was the physical limitation of his shoulder. In a substantial evidence review the agency's action will be sustained if the evidence is such that reasonable minds could have reached the conclusion that the agency must have reached to justify its actions. *Texas Health Facilities Com'n*, 665 S.W.2d at 453. Because the evidence was conflicting, the Board could have determined after reviewing Johnstone's reports that Green did not qualify under the Act for on-duty disability. *See id*. (If there is evidence to support either affirmative or negative findings on a specific matter, the decision of the agency must be upheld).

13

We overrule Green's first issue.

## III. Green's due-process claim is facially invalid.

In Green's second issue he argues that the Board's procedures lacked sufficient due process. Green did not specify at the trial court and does not specify on appeal whether his due process claim is predicated on the United States or Texas Constitution.

The due course of law guarantee of the Texas Constitution provides:

> No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land.

Tex. Const. art. I, § 19.

The Texas due course clause is nearly identical to the federal due process clause, which provides:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law.

U.S. Const. amend. XIV, § 1.

While the Texas Constitution is textually different in that it refers to "due course" rather than "due process," the Supreme Court of Texas regards these terms as without meaningful distinction. *Univ. of Tex. Med. Sch. at Houston v. Than*, 901 S.W.2d 926, 929 (Tex. 1995). Before any substantive or procedural due-process rights attach, however, Green must have a liberty or property interest that is entitled to constitutional protection. *Id*. A constitutionally protected right must be a vested right, which is "something more than a mere expectancy." *Klumb v. Houston Mun. Employees Pension Sys.*, 458 S.W.3d 1, 15 (Tex. 2015) (quoting *City of Dallas v. Trammell*, 101 S.W.2d 1009, 1014 (Tex. 1937).

The court's decision in *Klumb*, is dispositive of Green's due-process claim. In that case, the supreme court re-affirmed its decision in *City of Dallas v. Trammell*, that an individual has no vested property right to future pension distributions. *Klumb*, 458 S.W.3d at 15–16. The court held directly in *City of Dallas* that a pensioner has no vested right to future installments of a pension. 101 S.W.2d at 1017.

Green acknowledges *Klumb's* holding but questions its application to him because he may be entitled to pension benefits under the Act other than the disability benefits for which he applied. Specifically, Green asserts that he is eligible for benefits under section 8(a) of the Act, which entitles him to a deferred pension. *See* Tex. Rev. Civ. Stat. Ann. art. 6243e.2(1) § 8(a). Green asserts that, unlike the petitioners in *Klumb*, he has a vested interest in a pension from the Fund. Green did not make this argument to the trial court. Instead, Green asserted in the trial court whether the decision in *Klumb* remained viable after the enactment of section 66 of the Texas Constitution in 2003.

By failing to make this argument to the trial court Green waived consideration of such argument by this court. The complaint presented on appeal must comport with the complaint raised in the trial court. *See Doan v. TransCanada Keystone Pipeline, LP*, 542 S.W.3d 794, 807 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (issue waived because appellate complaint that condemnor made no bona fide offer of an amount within the trial court's jurisdiction did not comport with trial-court complaint that condemnor made no bona fide offer at all); *Moran v. Mem'l Point Prop. Owners Ass'n, Inc.*, 410 S.W.3d 397, 407 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (trial objection that witness was not identified as a fact witness did not preserve appellate complaint that witness was not identified as an expert).

Even if Green had made this argument in the trial court, the court would not have erred in rejecting it. The fact that Green may be able to apply for pension

benefits under a different portion of the Act does not give him a constitutionally protected property right subject to a due process claim. Those benefits are not vested benefits and are subject to the holding in *Klumb* just as the disability benefits are not vested property rights. Because Green has no vested rights in the disability benefits at issue, we hold his due-process claim is facially invalid. We overrule Green's second issue.

## CONCLUSION

Having overruled Green's two issues on appeal we affirm the judgment of the trial court.

/s/    Jerry Zimmerer
       Justice

Panel consists of Justices Christopher, Jewell, and Zimmerer.